May it please the Court, Shane Kramer, Brian K. Blayden-Paysner, on behalf of Appellants King County and King County Executive Dow Constantine, I'd like to reserve five minutes of my time for rebuttal and I'll try to watch the clock. The District Court erred in granting summary judgment in favor of the government on its instrument of transfer and intergovernmental immunity claims, particularly in the absence of an Article III case or controversy in this case. Most fundamentally, the government lacks standing to pursue any of its claims where it failed on summary judgment to set forth specific facts supporting traceability and redressability. The Court's recent decision in Murphy is on point and instructive. There the Court reiterated that it's a bedrock principle that a federal court cannot redress injury that results from an independent action of some third party not before the Court. And the Court should be reluctant to endorse standing theories that require guesswork as to how independent decision-makers will exercise their judgment. Importantly, the Court also reinforced that it's the government's burden as the plaintiff in this case to establish standing and that it must do so in the manner and degree required at this stage of the litigation. Is there any mystery as to who was conducting these flights? Uh, meaning the... Was there any mystery to the fact that the United States government had contracted with aviation organizations to conduct these flights, returning undocumented asylum seekers or others back to their country of origin? I think prior to that April time frame, I think there was a mystery as to that. It wasn't unclear how those flights were occurring, but by the time April of 2019 rolled around, I think people understood that. I haven't stated my question well. Let me try it again. Was there any mystery to the people that operated Boeing Field, King County Airport, that the United States was carrying out these flights using, in effect, subcontractors? That's not a mystery, is it? It was until sometime around April. Prior to that, maybe there was airport staff that might have known that, but the county as a whole didn't understand that they were going out or how they were going out. At the point in time when King County made the decision to tell these subcontractors, if I can call them that, to stop doing these flights, was there any mystery as to the relationship between the subcontractors and the government of the United States? At that point in time, the county understood that the flights were conducted by subcontractors, but I would disagree that the county ever instructed that the contractors stop servicing the flights. What did King County do? King County issued an executive order that had no present legal effect, had no effect whatsoever on the evidence on that. That's sort of immediate practical effect, right? I mean, based on the testimony of Modern to say, well, when we were informed of this, we then changed doing business with ICE. Modern's testimony is actually different than that. Modern's testimony is that when they started to get press calls because the media was reporting on the UW report that on its face accused the county and Modern of collaborating with ICE, that's when Modern decided for its own business reasons to stop servicing the flights. And the record evidence on that starts to appear at ER 494, where Modern says that it chose to stop servicing flights without any input from the county. Modern knew that the EO didn't require it to stop servicing flights. That's at ER 385 and 389. The county never asked Modern to stop servicing the flights. That's at ER 523. And Modern kept servicing the flights after the EO was executed. Modern knew it could do it. The county didn't complain because the county wasn't trying to stop the flights. That's at ER 630. What about the testimony from the Modern representative that said, if not for the executive order, Modern would have continued servicing ICE? That's the only evidence that the government has. And they ignore... How much more do you need? And the... I mean... Stop right there. How much more do you need if you've got the corporate representative saying that that's why they stopped the flights? Because... I mean, you may argue that that shouldn't be believed and so forth, but for a standing objection... So two points there. The Modern representative then clarified, question, now that you've seen the UW report, the report that was issued the same day that accused Modern of collaborating, now that you've seen the UW report again, is it still your view that it was the executive order that was the impetus for the potential threat of protest at Boeing Field? Answer. I would say that it may not have been the only cause. There may... There may have... Wait, wait, wait. Sorry about that. Is the impetus for what? Not for the secession of the flights, but for the protests. Well, that's a big leap. Let me put it to you this way. Since the entry of the injunction by the district court, have flights resumed? We've moved to strike that because it's not relevant to redressability or causation. I've asked a question. Yes, they have. Have flights resumed? And yes, they have. Well, that makes this whole argument to me sort of preposterous because if the flights stopped after the executive order was entered and the flights resumed after the injunction was entered, it's hard not to accept that there's a connection between the executive order and the cessation of flights. Murthy speaks to this, that where there are potentially independent impetuses, you need to view it in light of all of the other potential causal factors. And they say that's important because the whole purpose of the traceability requirement is to ensure that, in fact, the asserted injury was the consequence of the defendant's actions rather than of the independent action of third party. And to go back to your Honor's question about protests, that's the only link that the government can draw is that the EO caused the protests, caused the... Well, no, you can draw a more direct link than that. The EO says, don't sign up for renewals of lease or future leases if you can have these immigrant flights. And the contractor had leases, it gets kind of confusing and I'm lost in the morass, but had multiple leases, at least one of which seemed to be coming up for renewal within the next year. And that's a lease for a different piece of property that didn't have anything to do with where it serviced these flights. That doesn't mean the contractor didn't want to have that lease renewed and had reason to fear that it couldn't get that lease renewed if it didn't adhere to the standard that the county executive sought to impose upon it. But again, the modern witness testified clearly that the issue they were most concerned about was press and protesters. That was our primary concern. Modern knew it could continue doing the flights. And modern subjective third party fears, the Supreme Court in Clapper rejected that as a basis for finding traceability in these third party causation cases. This court, and we submitted a supplemental authority, agreed with that last week in an unpublished opinion, the Iran decision. But it's clear that those third party fears aren't based in the actual legal effect of the EO. And modern's contemporaneous documents stress that it's important that the protesters understand that we aren't involved in these flights going forward so we don't get any more protests or bad publicity. At the end of the day, it was our decision to stop accepting these flights. And that's a decision we made as a company for a variety of reasons. There were business reasons that you need to untangle to figure out what caused this. And the Novak case from this circuit sets the standard clearly that if there's evidence that the third parties may well have engaged in the activity, you don't have traceability as a matter of law. Now if you move to redressability, the Murthy case also speaks to that. When you have multiple potential independent causes, which is what you have here, redressability is no longer the flip side of the coin to traceability or causation because even if you could trace the action potentially to the government action, there could be several reasons why that third party might not change course. If we dissolved the injunction, is ICE free to contract with another subcontractor for removal flights out of Boeing Field? Can I finish my question before you interrupt me? Are they? Would that, in that circumstance, would they be free? Yes. The United States could hire another contractor and immediately begin removing aliens from Boeing Field? Yes. If the court were to remand this case, my expectation is that Signature would continue doing the flights and the county has no objection to that because the EO has no present effect. The EO doesn't preclude the county's... Here's what the EO says, ensure that all future leases, operating permits, and other authorizations for commercial activity at Boeing Field contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigrant detainees to the maximum extent permitted by applicable law. Their Signature, Kenmore, Audern, all have long-term leases under which any of them is currently free to provide these services to the charter companies. The EO did not stop any of them. Hasn't the county said it would resume the process of implementing the EO if anybody did that? But implementing the EO, and this is where it falls apart, is implementing the EO only means that in the future, in 2046, it might require, if it hasn't been rescinded by then, or politics haven't changed, or the need, the proprietary need hasn't changed, might take a different tact. Until then... I meant if a different, there's a different executive who might have different needs, or if the proprietary need for the disruptions is gone. But that's the point, is the future, the present effect, what Your Honor was talking about with moving forward with implementing, implementing only means acting in the future when these leases are up in 2047. It's pretty hard to read this as being something that's going to be relevant in 25 years. And that goes to injury in fact, that goes to causation, that goes to responsibility. And so if the county's position, this doesn't have any present impact, why is the county fighting so hard to retain it? Because it's an important directive that the county has implemented. So on the one side you're telling us it's not, doesn't have any impact, it's not worth the paper it's written on, and the other side you're telling us it's an important directive. It can't be both. It's both because it, one, sets the important policy aims of the executive. The county can proclaim its aims all at once. Here in this order it appears to be trying to be using its authority to implement its authority as the operator of the airport to prevent the government, the federal government, from conducting these flights. And you may argue to us, well, it doesn't really have any impact. But that doesn't seem consistent with the effort being made to issue it and to defend it now. Either it has an impact or it doesn't. If it doesn't have an impact, then why do you care? If it does have an impact, then isn't that why we're here? It was issued because there was serious and significant concern that Modern also shared, independent of the county, that they had been accused of collaborating with ICE and they were afraid that the same type of protest that took over Sea-Tac, that took over the Northwest Detention Center, that occurred throughout Seattle, would be aimed at... Can you point me to things in the executive order that suggests that it wasn't implemented because of the county executive's hostility toward the action being taken by ICE in deporting unlawful aliens as distinguishing, oh, this is all defense, we can't afford to put more than a couple of law enforcement officers there. So we're going to shut down the operation because we're afraid of protests. I mean, I read the executive order. It sure doesn't leave me with the impression that this is a self-defense mechanism as opposed to this is a political statement, which you suggested yourself in your reference a few minutes ago. It's an effort by the county executive to make a political statement, decree favor with a certain sentiment among the electorate. So what in the executive order should make me read it the way that you want me to read it now as opposed to the way it seems to be making a political statement? At the bottom of ER 624, there's a whereas clause that speaks specifically to the use of King County International Airport in this manner would be detrimental to the public welfare and could adversely affect the willingness or ability of other persons to use or engage in business at King County International Airport. So the second half of the sixth whereas clause is what you point to. How about the whereas clauses before that or the first half of that one? This circuit has recognized that you can have a policy motivation in engine manufacturers. They list all manner of market participant proprietary acts that you can take as the owner and operator of an airport that's in LAWA but relying on engine manufacturers saying you can have both and as long as it's narrow in scope and it deals with your property, you're acting as a market participant and that doesn't invalidate the proprietary nature of the concerns that you have. And going to one last point on regressibility, it is measured as of February 2020 when the case was filed, not today. Any inferences that are going to be drawn from the fact that flights have picked back up should be drawn in favor of the county because the EO did not preclude any FBO from servicing those flights in 2020. They could have started back up then. The fact that they chose not to as is the same as every other FBO and airport in all of Western Washington refused to pick up these flights because of the reasons totally unrelated to the executive order because none of those airports or FBOs operated at King County and were subject to the executive order. So and then the court has some time for rebuttal. I didn't mean to cut you off there. No, that's fine. Finish the thought if you like. I was going to point the court to Tucson v. City of Seattle earlier this year that has says regressibility is measured at the time. Thank you. There is a button on that podium if you want to lower it. You don't have to. I think I'm all right, Your Honor. Can you hear me okay?  Great. Thank you. May it please the court, McCain Newmeister on behalf of the United States. The district court properly determined that it had jurisdiction to hear this case and correctly invalidated the executive order because it violates both the instrument of transfer conveying ownership of Boeing Field to the county and the supremacy clause. Now on standing, the district court correctly found that the government demonstrated standing because it has already been injured due to the executive order and will be injured by the order in the future in a clear and predictable way. For similar reasons, the case is ripe and on the merits, the county's efforts to block immigration flights at Boeing Field by preventing ICE from using charter contractors and FBO services to carry out its transport operations clearly runs afoul of both the county's obligations in the instrument of transfer and the doctrine of intergovernmental immunity. The regressibility, causation, traceability, your friend on the other side says this is essentially an independent business decision by the FBOs. How do you address that point? So under Mendia v. Garcia, this court explained that when you have third parties, the entity trying to establish standing has to show that the action being challenged was at least a substantial factor motivating the action of a third party. And the district court surveying the record concluded that that test was satisfied here because Modern's representative clearly testified that the executive order was a but-for cause in its decision to stop servicing these flights. And that's at record 3 ER 391, where Modern testifies that if not for the executive order, it would have continued servicing ICE air flights. And that's sufficient to demonstrate causation in this case. And traceability is satisfied as well because given that it was a but-for cause of stopping servicing these flights, removing the impediment would have a predictable effect on the fixed-base operators, such that they are likely to redress the error by resuming services again. Mr. Kramer pointed to the Supreme Court's recent decision in Murthy. So how would you say that one, is that case different than this one? Yes, Your Honor. The facts in Murthy are very different than the facts we have here. The social media platforms, which were the third parties in that case, had independent policies that caused them to moderate content. And even before the government got involved in talking to the platforms about content moderation with respect to various topics, before the government had any communications with them, those platforms were already moderating the content at issue. Plaintiffs there were not able to show a sufficient connection between the government's involvement and the decisions to moderate specific speech, specific content on those platforms. Here we have a very clean connection. On summary judgment, we have testimony from the third party that the executive order was a but-for cause in their decision to stop servicing these flights. Mr. Kramer also referenced the idea that what was contemplated in the executive order was something that would happen sometime in the future. It wasn't a here and now thing. How does the government address that point? Yes, Your Honor. The express purpose of the executive order was to stop these flights. It's titled a prohibition on immigrant deportations. It was the express purpose and it was the effect. And if you look at the directives in the executive order, it's clear that the purpose of these directives is to stop these flights sooner or later. In paragraph three, it talks about inserting prohibitions into existing leases. But if you look at paragraph four, it directs officials to amend relevant regulations so that it can enforce this policy against current leases as well. There's no waiting for 2046 until a long-term lease is up. The county officials are directed to find a way to enforce this policy against current leases. And as Your Honor has noted in talking to my friend on the other side, there was a lease that Modern had that was up for renewal one year later. And so this was not a far in the future scenario. They were imminently facing the prospect that they would have to put this prohibition in one of their leases at the airport. Was Modern asked in discovery what would happen if the county rescinded the executive order? I'm not aware that they were, Your Honor. Okay. But ultimately, their testimony is sufficiently clear. I understand your position. I just wondered. I don't believe the question was asked in quite that way, but they made it clear on page 391. I referenced that this was about for cause of the decision to stop the flights. And my friend on the other side talks about these independent reasons and the protest risk. I encourage Your Honor to actually look at the record. It doesn't describe those as independent reasons. It talks about a number of factors for this decision. And as the district court concluded after surveying the record, even though there was protest risk, there might have been other factors as well. The executive order was at least a substantial factor motivating their decision, which is all that's required for purposes of standing. How much time elapsed between the issuance or publication of the Washington Center for Human Rights study and the signing of this executive order? So I believe the county undertook to issue the executive order after they received notice that Washington was going to be issuing this study. I believe that the county ultimately was able to issue the executive order first and that the study came out a day later. But I don't, I'm not 100 percent on that, Your Honor, but I think that's what the record reflects. My notes say that the report was issued in April of 2019. Yes. And that the executive order was signed a few days later. I'm not sure exactly the timing, Your Honor. It was a couple days in one direction or another. I know that the county was told by UW that it was going to be issuing this report. And so the county then undertook to issue this executive order shortly following or simultaneous with that report to take action here. Again, the express purpose of this order was to express disapproval of these flights, to prohibit the flights. And the county did it through the means that they had available, which was to deprive these flights of fixed base services. And Your Honor, on the merits, that's simply not something that the county is entitled to do, both under the instrument of transfer and under intergovernmental immunity. Under the instrument, the government cannot make use of the airport, rather ICE Air Flight specifically cannot make use of this airport without the use of fixed base services. The district court recognized that. Anything from parking to having access to maintenance, fueling stairs so that individuals can get on the plane and get off the plane. All of those things require fixed base services for ICE to actually meaningfully use this airport. There were some jurisdictional type arguments made on this point. Has any court addressed any of these? I'm not sure I saw that in the briefing. I'm not aware, Your Honor. My friends on the other side cite some cases, but those cases don't squarely address whether the provision that we're talking about, 47-151B, is a jurisdiction stripping provision. And if you look at the Supreme Court's decision in Patchak v. Zinke, for instance, all the relevant factors indicate that this is not a jurisdiction stripping provision. What would be the implication if it were? Who would be dealing with this issue? It would just be an agency issue? That's my understanding of what the county is arguing, Your Honor. But there's simply no jurisdiction stripping here. We have the general availability of federal question jurisdiction and suits brought by the United States to pursue this action. And there's no reason that this issue needs to be heard specifically in administrative proceedings first. On the supremacy clause argument, your friends on the other side raise a commandeering defense essentially. Can you respond to that? Yes, Your Honor. The circumstances of this case are fundamentally different than circumstances that implicate commandeering. Here, the county is not being forced to affirmatively implement a federal program. They're merely being asked to stop affirmatively obstructing that program, which under the supremacy clause, they don't have any right to do that. So, being told that they have to adhere to their deed of transfer and the supremacy clause and not affirmatively attempt to prohibit these flights, which is the stated purpose of the order, is not equivalent to commandeering the county's resources to implement an immigration program. Does the county have to expend any resources in accommodating this kind of flights at the airport? Whether or not they do that is not the same as being commandeered, Your Honor. Responding to federal conduct is not the same as being forced to implement a federal program. Is there some level of support at the airport if they were directed to provide extensive security or some other things like that that would rise to the level of commandeering if there were things unique to these ICE flights? I'm just trying to understand what the line is between essentially accommodating lots of people at the airport, including ICE, and maybe having to take additional steps to ensure that the ICE flights are successful. If there was a scenario where the government was saying to the county that they were obligated to take these steps, that it was part of this immigration program is that the county is forced to support the program through local law enforcement in specific ways, that would be a very different set of facts than what we actually have here, where the county is claiming that it does have to provide certain law enforcement or security support, but that's its response to federal activity. If the President of the United States were visiting Seattle and decided to fly into Boeing Field and the county decided to provide additional law enforcement support to secure the airport, you wouldn't say that the President was commandeering the county. That's simply not what's going on. The county's response to federal activity is not the same as being forced to implement a program. I'm happy to answer any other questions that the court may have, but it's clear based on the record in this case that there is standing because the executive order was a but for cause in Modern's decision to stop servicing these flights, that the order, when implemented, and as your honors noted, the county testified that the only reason it did not move forward with implementation is because the flight stopped. Because the executive order was so successful, ultimately they didn't have to move forward with it, but that's no reason to say that there's no jurisdiction for hearing a challenge to the clear directives in this executive order. On the merits, as we've discussed, there's simply no constitutional authority or other authority for the county to attempt to block these flights. It runs afoul of both the instrument of transfer and the doctrine of integral hormonal immunity. So if there are no further questions, we would ask this court to affirm. Thank you. Thank you.  Good morning. I'd like to respond quickly to a few of the things that were raised. One, Mendea isn't the right standard. It's Novak. This is a Novak-Murthy case. Mendea deals with when you have one chain of causation and you need to have a substantial cause as part of that one chain. This is a case about independent causes. On addressability, it's not enough that it was predictable that an FBO might take up the flights. Under Novak and the circuit's precedent, you need to have shown that there would be a change in legal status. There was no change in legal status because the executive order didn't have any legal effect. Let me ask you what I asked the counsel of the government. In discovery, did you or anyone else ask Modern what would happen if the county rescinded the executive order? It was no. The government deposed Modern for a full day. Didn't ask that question because they likely didn't want to know the answer that they were going to get. Nor did your side. We don't have the burden. We knew. We knew that Modern had independent reasons for stopping the flights. You asked about the dates. It was issued April 23rd. That's at 563. On commandeering, commandeering is not just asking personnel to do something. Commandeering is also making you use your property, your facilities to support the government's immigration program. That's McHenry. That's this court's decision in California. If in Prince it was overstepping to make a police officer do a background check, it is certainly overstepping to require that the county allow its facilities to be used for detention purposes. The detainees are still in the detention system. There's no difference here from McHenry or California on the intergovernmental immunity basis. On the instrument of transfer issue, all of the evidence submitted to this court demonstrates that the county's interpretation of the instrument of transfer is correct. The House and Senate reports in favor of the Surplus Property Act make clear that when it says government use, it means government aircraft. That language is used specifically in the reports. It's later used by Congress in the Airport Improvement Program, which deals with grant assurances, which deals with the same subject matter as the SPA. You interpret the terms identically and consistently. The FAA has defined that to mean government-owned or operated aircraft, which everybody acknowledges these weren't. How long have these flights been going on before the executive order? They had been going on, I believe, it's in the record, since 2005 or before. That goes to show the proprietary reasons for adopting this. It was not about the flights necessarily. It was about the fear of the protesters and the disruption and the damage to property once the county was accused of collaborating with ICE, which the Supreme Court said in Murphy is one of the primary reasons why the anti-commandeering doctrine exists, to avoid and allow states and localities to withdraw themselves because of that blurred line, those blurred lines. Right, but I mean, that is not really how the order reads. I mean, there's a reference to that, but most of this is about a particular stance on the government's policies, viewing it in terms of human rights, so it seems much broader than just this concern about disruption at the airport. It had two purposes. I will acknowledge that, but it can, and especially when it had no teeth. It was a policy statement intended to hope that it prevented the disruptions at the airport. It was successful in that, and that's why it's not the cause of Modern stopping the FBOs. It was actually trying to accomplish the same thing that Modern was, which was make sure that nobody's billion-dollar planes got destroyed because everybody rushed the airport on May Day when the anarchists come. That's the gist of it. Okay, we'll let you go a little bit over your time, and I want to thank you both for your briefing and argument this morning, and this case is submitted.
judges: HAWKINS, CLIFTON, BRESS